Excuse me, my book fell apart somewhere between chambers and gears. Pardon? My book full of my notes. The exact same thing happened to me this morning. It opened up and half the pages fell out. I'm happy. I'm fussing. I'm happy to wait. No, no. We're ready. Okay. I'm not as distracted as I look. Good morning, Your Honors. My name is Greg Erickson, and I'm here to represent the appellant Benjamin Zarn, who is in the courtroom with us today. The standard of review is de novo. And what we are asking for is for a reversal of the district court's entry of summary judgment against Mr. Zarn's claims and a remand for trial. The main important facts here are Mr. Zarn was an employee at a mental health facility in southern Minnesota. He is a Roman Catholic and expressed reservations about the COVID-19 vaccine mandate to not one, not two, but three different parties. The first party that he expressed his concerns with the vaccine and testing mandate to was his boss, who was a mandatory reporter, and she testified under oath that she should have reported his concerns to management and dug in deeper to figure out what his concerns were. When he didn't get any response from his immediate supervisor, what he did is he went to his union representative, Ryan Cates, and he asked Mr. Cates to go to Human Resources and figure out a way that he could ask for a religious exemption from the testing policy. The Human Resources representatives told Mr. Cates that there was absolutely no procedure, no methodology by which he could submit a religious exemption to the testing policy. Did Mr. Cates, though, testify to his deposition that he didn't say anything on behalf of Mr. Zarn himself? Now, was that his testimony? It's quoted by the other side. If I was at his deposition, and I think it was more succinctly, he could not specifically remember mentioning Mr. Zarn. Okay. That's what he said. And so that's why we asked the other side in discovery for all information regarding contacts on behalf of Mr. Zarn. Okay. And what happened when I did that? The State's representative, and I believe her name is Allison Kuhlman, testified that she didn't review any documents. She didn't interview anyone. She did nothing to determine whether or not they had actually, that Mr. Cates had actually communicated Mr. Zarn's objections to the COVID-19 vaccine testing mandate to them. So there's absolutely no way that they should be able to do no investigation whatsoever in violation of all the discovery rules and then benefit from it by being able to say, well, he never told us. How do you know that you were never told when you never looked? In our brief from page 20 to, I believe, about page 26, I go over about 15 pointed questions that I ask the State's representative. And in each instance, it basically shows that they did nothing. They did no investigation. And then later in our brief, towards the end, we obviously cite all the axioms that when you don't, you know, make any efforts in discovery, you can't benefit from that at the summary judgment stage or, frankly, at trial or any other stage. The third, so once Mr. Cates came back and told Mr. Zarn that there was absolutely no road for him to submit a religious exemption for testing, which, of course, he relied on, and, of course, under the laws of agency, obviously, you know, a communication from Mr. Zarn's agent is like a communication from Mr. Zarn himself. It's like Mr. Zarn being told that there was no avenue for an objection. Mr. Zarn was undeterred and went to the source of the mandate, and that's Minnesota Management and Budget. And, frankly, the testimony is relatively clear here that the Minnesota Department of Human, I'm sorry, Human Services had absolutely no role in enacting the COVID-19 mandate. It was strictly just implementing what the mandate's terms were to its employees. So he went right to the source and made his objection there, which is, in his mind, the absolute best idea in terms of his ability to let the government know what his objections were to this policy and how it was negatively affecting him. Now, the district court says that each of the three that you've described appear not to have communicated Zarn's concerns to the right person. Do you think that's true or not? Absolutely not, Your Honor. Well, counsel, in your brief, you have the same words. Page 39 of your brief. No, no, no. I'm sorry. My point is I disagree with the premise that he has to find the right person. He communicated under their rules. His boss is a mandatory reporter. His boss didn't report it. So they should not benefit from his boss not following the rules that are implemented for the benefit of the employees of the state. It does not follow that you can have an employee breach their responsibilities and then later in litigation benefit from that breach. That doesn't make sense to me. It's not equitable. Secondly, to me, what could the Department of Human Services have done when they had no authority over the mandate? He went right to the source to submit his objection, which, you know, to me makes logical sense. Counsel, am I correct that he did do the saliva test and that he's still employed there? Both things, right? That is correct. And our position relative to that is that just because you're forced, like in coal, to do something that you find humiliating to keep your job doesn't mean that you don't have a claim under coal, because the standard is different than it was a number of years ago. I'd like to reserve the rest of my time for rebuttal. Thank you. Mr. Taylor. Good morning, Your Honors. My name is Ian Taylor, Jr. I'm representing the Department of Human Services, and we're here to respectively request that you affirm the district court's decision granting summary judgment motion. I want to pick up on something clear just coming from that last conversation. What's the standard here in the Eighth Circuit regarding notice to an employer? I think that the best sort of instruction for what we should look for is in Hunter v. UPS, where this court held that an employee, particularly an employee with a non-obvious protected status, must show that the employer was sufficiently aware of the employee's status to have been capable of discriminating based on that. That is evident in none of the communication that Mr. Zarn discusses or asserts in his brief. The Hunter case says there's, quote, no evidence, unquote. It says no evidence two or three times there in a few paragraphs. And they mean absolutely no evidence. Okay. Is there enough evidence here? Your Honor, there is none. No. There's no evidence. And there's actually even a deeper issue than what was addressed during the questioning of my colleague here, because even the communications that he points to make no mention of religion, except in one instance. The one instance where there is mention of religion is where he speaks to Mr. Cates, where the communication was specifically he asked his union president to ask the executive management team if he could have a religious exemption from the testing. And Mr. Cates testified he understood that as whether or not, as clarity on the policy, whether or not there could be a religious exemption to the testing. He didn't understand it, and he did not communicate it as a request for an accommodation, which is the standard here. And so the other communication pieces, the e-mails to MMB, to DHS, as well as his conversation with Ms. Robbie Bach, they also get to that failure as well. Second, the district court properly dismissed Mr. Zarn's ADA claim, and it should be affirmed on the alternative basis that even if it wasn't an unlawful medical examination, the policy was job-related in a business necessity. It's important to contextualize. So specifically this ADA claim is regarding the testing aspect. That was Mr. Zarn's challenge to it. And it's important to look at the context in which this policy was implemented, the COVID vaccination and testing policy. It's 2021. Almost 8,000 Minnesotans have died because of the disease. The Centers for Disease Control and Prevention, as well as the Minnesota Department of Health, is guiding MMB. It's guiding Minnesota Department of Human Services in saying the best thing that we can do is ensure that, or encourage folks to be vaccinated for COVID. So DHS took a stand. It took a stand to protect its employees and its patients and create this policy that encouraged individuals to do that. Now, my colleague also mentioned how Mr. Zarn works in a mental health facility. He has a very important job where he works directly with patients. Very often he's within six feet of them. He plays games with them. He watches television with them, has conversations, builds relationships with them. And all satisfactory on work, right? I'm sorry, Your Honor? His work was all satisfactory, right? There's no indication in the record of unsatisfactory work. There's no indication of unsatisfactory work, Your Honor.  Thank you. And he took his job seriously. And during the deposition he testified to the importance of maintaining the safety and security of his patients. Now, the fact that you have to, someone in Mr. Zarn's position has to work so closely with his patients, shows that this was a job-related measure. Because when you have a disease, right, that's known to be highly contagious and can affect folks, it's important for the employer to understand how they can protect their patients. It's important to know whether they have COVID. I thought the adverse employment action, lack of it, was pretty darn clear here. Policy one said get vaccinated or be tested weekly, and he complied. If COVID is contracted, paid administrative leave for isolation. He didn't request that. So plaintiff's response, as I understand from the briefing, is well, the argument, testing against religious beliefs is now harm under Muldrow, which to me is a vast extension of that decision. But what's your response? Your Honor, our response is that it is not a harm under Muldrow. For one, the testing wasn't done because of a protected trait. It was not done because of Mr. Zarn's faith. And it also wasn't a disadvantageous application. It's our position that the testing, which was required for all agency staff, it was applied to everyone, regardless of what their religious status was. And, you know, I want to sort of emphasize that our argument here is not that there is a lesser degree of harm, which I think is what Muldrow was really getting at, that they're throwing away the severity of the harm here. Our position is that the nature of the harm, the fact that, well, not the harm, but the nature of the testing was that it was applied to all staff and that it wasn't because of his trait. That's our position, Your Honor. And going to the other aspect of the ADA claim regarding the business necessity, under EEOC guidance, it's a business necessity to use the COVID vaccination screening, to use a COVID viral test. It's a business necessity when there is guidance by the CDC as well as a state health agency. And that's what we have here. In addition to the EEOC guidance, we relied, as we show in our brief, we relied on several district court cases, not just here in the District of Minnesota, but across the nation that had found similarly in that situation. Of course, a few district court cases were reversed on religious discrimination in regard to COVID, but I'm trying to think if there's one that's similar. In most of those, it is the district court saying that there was no belief, no sincerely held belief. That's not an issue here. So be careful which Minnesota district cases you rely on. Absolutely, Your Honor. And we are comfortable with our review of the case law because, you're right, there have been several that have been reversed. Typically, they have been in the motion to dismiss phase, getting at the sincerity of an individual's belief. And here, we went through discovery. We investigated the claims. We deposed individuals, and we got to the nature of what had happened, and we saw that there was simply a failure to provide notice to the employer of a conflict, a religious conflict with the COVID vaccination and testing policy. Well, if I don't have any other questions, Your Honor, then I will waive the remainder of my time. Let me just double check. Thank you. Thank you, Your Honors. Thank you. Thank you. I'm not going to get too much into the weeds on the wisdom of the mandate, but I will point out that in footnote two, I do reference a communication from Rochelle Walensky. She was the head of the Centers of Disease Control. And in late July of 2021, she found that both the vaccinated and unvaccinated had identical viral loads when dealing with the Delta virus. So the point is, if the safety of the employees was at issue, everybody needed to be tested. And frankly, during her deposition, Mr. Zarn's boss also agreed that everyone needed to be tested if safety was truly the reason for the testing mandate, because she, of course, was COVID vaccinated and got and was able to transmit COVID during that time period. I did want to address the district court's . . . Public perceptions? We're talking about someone who's treating patients at a mental health facility. So . . . It doesn't matter that after the fact, well, the viral loads were the same, so all this concern was irrational. No, no. Your Honor, July of 2021 is months before the mandate was installed. Okay? So we're not talking about information. If you cannot rely on communications from the Centers of Disease Control, what can you rely on? So, I mean . . . Who's relying? I don't understand the argument. What you're intimating is that the . . . I'm talking about the business necessity decision. The business . . . there was no business necessity. Well, yeah, that's fine to say after the fact. No, it was like . . . But we knew at the time that there was no business necessity. That's the point that I'm making. Nobody did. Everyone . . . Everyone had a big home. Everyone with a medical background did. Maybe the politicians didn't, but the people with the medical backgrounds did. They're running a facility for people being treated, public citizens being treated. And at that time, the vaccinated and unvaccinated were all catching and transmitting COVID. So, if public perception of the safety of patients was at issue, then you needed to test everybody. That's common sense, but they didn't want to do that. That's also a lot of . . . also very expensive. Well, is cost an issue, or is actual . . . is patient safety really a concern? Because if it is, then you've got to test everybody. I also want to point out that the testing was every 12 to 14 days. What is everybody? Pardon? Who is in your universe of everybody at this mental health facility? All the employees, the vaccinated and the unvaccinated. Whether they're dealing with patients or not. That's correct. That's correct. You'd make a wonderful legislator. I'm sure the testing companies would like me. But the last thing that I wanted to point out is the district court's concern about the EEOC filing that Mr. Zarn did. Those issues were addressed in Ringhofer. All you need to do with an EEOC filing is generally notify about the claim and the thing at issue. What was at issue in the EEOC claim was the COVID-19 mandate. Within that mandate is the discrepancy in COVID pay between the vaccinated and unvaccinated that we objected to in our complaint. All of the cases that related to these EEOC filings talk about later filing a sexually discrimination claim when you originally filed a religious discrimination claim. Something totally different. What's your support for your Muldrow argument? Pardon? What's your support for your Muldrow argument? What's the support for my Muldrow argument? Your interpretation of Muldrow. Cole. Cole would be the support. In Cole. You're talking about a witness now or a case? A case. Pamela Cole. I argued it in front of the University of North Dakota, in front of the Eighth Circuit, and they ruled in my favor. So Cole, in Cole, Ms. Cole was forced to wear an orange badge, and that was found to be enough harm to fall within Muldrow and the new Eighth Circuit standard as it relates to harm. It's no longer materially significant employment impact. That's not the standard. Right. New standard is some impact. Testing and COVID pay discrimination is some impact. If it's against your religious beliefs and you feel like you're sinning when you're doing it, but you need to do it to keep your job, that's an impact. That makes your job terrible. I have nothing further. Thank you for your time. It's been a long week. The case has been thoroughly briefed and argued, and we'll take it under advisement.